904 A.2d 797 (2006)
387 N.J. Super. 506
STATE of New Jersey, Plaintiff-Respondent,
v.
John DeMARCO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 2005.
Decided December 27, 2005.
Resubmitted February 1, 2006.
Decided August 18, 2006.
*798 Jean D. Barrett, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Barrett, of on counsel and on the brief).
Deborah Bartolomey, Deputy Attorney General, argued the cause for respondent (Zulima V. Farber, Attorney General, attorney; Ms. Bartolomey, of counsel and on the brief).
Before Judges STERN, PARKER and LIHOTZ.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant appeals from a post-conviction order denying his application "for post-conviction DNA testing." Defendant is serving a sentence of life imprisonment, with thirty years parole ineligibility, for murder and a merged weapons offense, following his conviction for the 1990 murder of his girlfriend, Karen DeStefanis. On this appeal, defendant argues that "the trial court erred when it concluded that Mr. DeMarco had not met the threshold requirements for DNA testing pursuant to N.J.S.A. 2A:84A-32a."
The post-conviction court originally concluded that defendant failed to show that "the evidence to be tested is available [and] in a condition that would permit the requested DNA testing" because the multiple prior DNA testing had depleted the evidence. The judge also concluded that the chain of custody was lacking and that, in any event, proof that the DNA was not *799 defendant's would not give rise to a new trial, because evidence on that subject had already been presented to the jury, which nonetheless found defendant guilty.
However, defendant claims that there is remaining semen evidence, as well as hair and fiber evidence that previously was not tested, and he contends that if new testing uncovered "proof that the semen recovered from the victim's body belonged not to John DeMarco, but to a known sex offender," he would be "entitle[d] . . . to a new trial based on newly discovered evidence." Stated differently, defendant asserts that if he can identify the person whose samples remained on the body of the victim or at the scene of the crime, further investigation might reveal a motive or reason for the killing by that individual and warrant a new trial. In essence, defendant contends that additional DNA testing based on technological improvements in the scientific community will identify the person he believes to be responsible for the crime, and that he has a right to develop his claim under N.J.S.A. 2A:84A-32a. He further asserts that such identification would not have been possible through existing DNA testing techniques at the time of his 1994 trial.[1]
Because it was not clear from the record whether any biological sample still existed eleven years after the conviction, and whether the samples were in a form that would permit further DNA testing, we remanded for further findings and conclusions on the post-conviction application.
Upon receipt of the January 17, 2006 certification of Somerset County Assistant Prosecutor James L. McConnell, and after conducting a hearing on the subject of our remand, the trial court filed "supplemental findings," detailed as follows:
1.) It is apparent that virtually all of the evidence in this case has been retained by the State. This includes numerous boxes containing various items of physical evidence, photographs and charts.
2.) Part of this evidence includes a box which contains certain biological samples. Among these samples is a vial entered into evidence by the Defendant under the designation D-14. This vial contains the upper portion of an oral swab from the victim's autopsy. This is the swab which was the only one previously found to contain any viable DNA samples. This swab was tested four previous times, with the last examination being performed by a defense expert. An attached laboratory report and lab notes reveals that this swab has been almost entirely consumed. There are also two additional vials, one containing the upper portions of an autopsy vaginal swab and the other the upper portion of an autopsy rectal swab. Also inside this box were three vaginal smear microscope slides, three rectal smear microscope slides, and three oral smear microscope slides. A sealed plastic box containing three additional microscope slides was also in the box. The Assistant Prosecutor further believes that there are additional oral, vaginal, and rectal smears. There were also four *800 vials of the victim's blood along with two vials of the Defendant's blood. These vials have not been refrigerated since the end of the Defendant's trial. In fact, the Assistant Prosecutor believes that they were never refrigerated. There were also six small sealed envelopes which are apparently related to the original DNA examination conducted by the F.B.I. Additionally, there were two sealed plastic bullet boxes containing several small laboratory vials which were obtained from the Defendant's first DNA expert.
3.) Significantly, the box containing the aforementioned biological samples has been in the State's possession since the Defendant was found guilty in June of 1994. Before that time, from the end of the Defendants first trial in April of 1993, until the beginning of his second trial, the box was in the possession of the trial court, defense counsel or defendant's experts.
4.) The Assistant Prosecutor also found in another box of evidence three test tube-sized vials, each containing a swab from the victim's autopsy. One is an oral swab, the second a vaginal swab and the third a rectal swab. Additionally, the Assistant Prosecutor found two Petri-type dishes containing filter paper with the Defendant's saliva samples. These vials and Petri-dishes were placed in the box with the other biological samples.
5.) The Assistant Prosecutor further advises that approximately sixty microscope slides containing mounted hairs and fibers were also found. Because the hairs and fibers were mounted for microscope examination, the Assistant Prosecutor is unclear how they could be used in DNA tests.
6.) Finally, several small envelopes containing the victim's head and body hair and Defendant's head and body hair were also found in evidence.

I.
The background with respect to DNA testing in this case is detailed in our 1994 pretrial opinion stemming from the successful appeal of defendant's then-expert, who endeavored to preclude the State's attempt to obtain discovery of the expert's reports concerning tests conducted for other clients:
The victim's nude body was found by a hunter in a remote area of Hillsborough Township in December, 1990. She had been stabbed at least twenty times.
During the autopsy, the medical examiner took specimens from the victim's body for microscopic analysis. Among those specimens were fluids obtained by swabbing the oral, vaginal and anal orifices. One of the oral swabs revealed the presence of semen. These results were reported to the Somerset County Prosecutor's Office, which subsequently forwarded the swabs and slides to the FBI for DNA analysis. See United States v. Jakobetz, 955 F.2d 786 (2d Cir.), cert. denied, [506] U.S. [834], 113 S.Ct. 104, 121 L.Ed.2d 63 (1992), and State v. Cauthron, 120 Wash.2d 879, 846 P.2d 502 (1993), for explanations of DNA typing for purposes of identification.
The FBI utilized what is known as the RFLP DNA test procedure. This procedure examines the cells which are contained in the evidence samples and requires a relatively large amount of specimen to obtain a useful result. On May 23, 1991, the FBI issued a report concluding that the semen specimen could not be analyzed because the DNA was "degraded and/or insufficient." The exhibits were returned to the Somerset County Prosecutor's office *801 and made available to defense counsel by order of the trial court.
Defense counsel retained the services of Dr. Edward Blake of Forensic Science Associates, Richmond, California, to conduct DNA testing on the sperm-bearing swab. Dr. Blake used a technique known as Polymerase Chain Reaction (PCR). The PCR technique involves extraction of DNA material from the evidence, and amplification of the DNA material to obtain a sample sufficient for typing purposes. See State v. Williams, 252 N.J.Super. 369, 599 A.2d 960 (Law Div.1991), for a description of the PCR technique and Dr. Blake's role in that case in behalf of the State.
Dr. Blake identified semen on the oral swab, extracted a minute amount of DNA material from the swab, amplified the extracted DNA material and examined it. As a result of his analysis, Dr. Blake concluded in his report that defendant "can not be the source of the sperm recovered from the DeStefanis oral swab." Dr. Blake's report was received by defense counsel in September 1992.
[State v. DeMarco, 275 N.J.Super. 311, 313-14, 646 A.2d 431 (App.Div.1994).]
Because defendant was not the source of the semen found in the victim's mouth, before the first trial the State moved to dismiss counts four, seven, eight and nine of the indictment, which had alleged felony murder based on a sexual assault, aggravated sexual assault during a robbery and kidnapping, aggravated sexual assault with a weapon, and aggravated sexual assault by force, respectively.[2] Additional counts alleging robbery and felony murder during a robbery were dismissed during the first trial in 1993 before the jury deadlocked during deliberations, and a mistrial was declared. At the second trial, in 1994, defendant was found not guilty of kidnapping and felony murder, but was convicted of purposeful or knowing murder[3] and possession of a weapon for an unlawful purpose.
We affirmed the convictions for murder and the weapons offense in an unpublished opinion on April 23, 1997. Our opinion included the following:
This was a case in which, based upon the credible circumstantial evidence, statements by the defendant containing details of the remote area where the victim's body was found that would have been known only to the murderer, and based upon credibility assessments which reasonably could have been made by the jury, there was ample evidence to support the verdict. The jury was aware of tests that suggested the victim had engaged in consensual oral sex with someone other than defendant shortly before the murder. In recognition, the prosecutor had earlier moved to dismiss the counts relating to sexual assault.
. . . .
[W]e note that this was not a case where the State deliberately adopted fundamentally inconsistent versions of the facts from those earlier advanced, solely to enhance its chances of success. At the time of the indictment, the State had reasonable circumstantial basis for believing that the murder was associated with a sexual assault and kidnapping. When DNA tests ruled this out, the State proceeded promptly to dismiss the counts relating to sexual assault and to *802 delete sexual assault as an aggravating circumstance of the murder. The State then focused on the victim's infidelity as a motive. The positions are not clearly inconsistent and have benign explanations.
The trial judge reasonably exercised his discretion in denying defendant's motion to permit introduction of the foregoing, explaining his ruling in a written opinion of February 17, 1994 with which we agree, substantially for the reasons set forth therein. . . . As the jury was fully aware that semen found in the victim's mouth came from someone other than defendant, even were there error in this ruling on admissibility, we find no reasonable basis to conclude it could have contributed to an unjust verdict.
[Footnote added to body.]
We accept the State's description, in its brief filed before our remand, of the DNA forensic evidence at the 1994 trial:
Defendant did not testify at this trial, but the defense called several witnesses on defendant's behalf. The defense called an expert, Dr. Edward Blake, who testified that in his opinion defendant was eliminated as the source of sperm found on a swab taken from the victim's mouth. Another defense expert, Dr. Michael Baden, testified that, based on information he had, in his opinion the knife found in Branchburg did not cause five of the 49 stab wounds. Other experts testified to their opinions that the victim was not stabbed where she was found; that various items in evidence contained no soil for comparison purposes; that there was no ridge detail present in a blood pattern of finger marks on the body to give it comparative value; that various items of evidence either did not test positive for blood or contained human blood that could not be typed; and that a hair found on the victim's body after it had been transported to the Ocean County Sheriff's Department did not compare to defendant's control pubic hair.
[Internal citations omitted.]
Defendant further notes in his brief that the State "challeng[ed] Blake's opinion with questions about the difficulty in conducting PCR analysis on a mixed sample and allowing contamination in Blake's laboratory [and by arguing] [i]n summation. . . that Blake was wrong and the source of the sperm could have been Mr. DeMarco."
It is thus clear that defendant has endeavored to exonerate himself through DNA testing since the time of his arrest and that DNA testing has had a substantial impact on this case. Defendant waited over nine years following his conviction in 1994 to file an application pursuant to N.J.S.A. 2A:84A-32a "for performance of forensic DNA testing."

II.
N.J.S.A. 2A:84A-32a permits a defendant serving a sentence of imprisonment to apply for post-conviction DNA testing. Among the information to be included in the motion, which must be by affidavit under oath or by certification (see R. 1:4-4(a),(b); State v. Molina, 187 N.J. 531, 542, n. 5, 902 A.2d 200 (2006)), the movant must "explain why the identity of the defendant was a significant issue in the case" and "how if the results of the requested DNA testing are favorable to the defendant, a motion for a new trial based upon newly discovered evidence would be granted. . . ." N.J.S.A. 2A:84A-32a(a)(1)(a),(b).
N.J.S.A. 2A:84A-32a(d) provides:
The court shall not grant the motion for DNA testing unless, after conducting a hearing, it determines that all of the *803 following [eight conditions] have been established:
(1) the evidence to be tested is available and in a condition that would permit the DNA testing that is requested in the motion;
(2) the evidence to be tested has been subject to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced or altered in any material aspect;
(3) the identity of the defendant was a significant issue in the case;
(4) the convicted person has made a prima facie showing that the evidence sought to be tested is material to the issue of the convicted person's identity as the offender;
(5) the requested DNA testing result would raise a reasonable probability that if the results were favorable to the defendant, a motion for a new trial based upon newly discovered evidence would be granted. The court in its discretion may consider any evidence whether or not it was introduced at trial;
(6) the evidence sought to be tested meets either of the following conditions:
(a) it was not tested previously;
(b) it was tested previously, but the requested DNA test would provide results that are reasonably more discriminating and probative of the identity of the offender or have a reasonable probability of contradicting prior test results;
(7) the testing requested employs a method generally accepted within the relevant scientific community; and
(8) the motion is not made solely for the purpose of delay.
[N.J.S.A. 2A:84A-32a(d) (emphasis added).]
As previously noted, prior to our remand, the trial court denied defendant's motion for DNA testing, finding that defendant had not satisfied the conditions of N.J.S.A. 2A:84A-32a(d)(1), (2), (5), or (6)(b). We address each of these prerequisites in light of the judge's thorough and expeditiously filed "supplemental findings" on the remand.

III.
The court's supplemental findings reveal that virtually all of the biological evidence still exists and has been maintained in the custody of the State since defendant's 1994 trial. In fact, the judge expressly found that "virtually all of the evidence in this case has been retained by the State." Moreover, it is undisputed that "DNA testing has become more common and more reliable" since the early 1990s. State v. Peterson, 364 N.J.Super. 387, 398, 836 A.2d 821 (App.Div.2003). Indeed, the trial court in this case acknowledged that "state of the art" DNA testing now enables the testing of extremely small or degraded DNA samples. Hence, the trial court's supplemental findings demonstrate that the evidence is available and in a condition that would permit the requested DNA testing. N.J.S.A. 2A:84A-32a(d)(1).
The supplemental findings also confirm that the box containing much of the biological evidence "has been in the State's possession since the Defendant was found guilty in June of 1994," and "was in the possession of the trial court, defense counsel or defendant's experts" from the end of defendant's first trial in April 1993 until the beginning of his second trial in June 1994. The State obviously would not have questioned the chain of custody with respect to any evidence it may have introduced at defendant's second trial, after defense counsel had possessed it for testing *804 before the trial.[4] Since the conviction, the evidence has been in the State's possession, and there is no specific allegation that it has been tampered with or altered in any way. See R. 1:2-3. Thus, there is no basis to preclude further DNA testing because of the chain of custody. N.J.S.A. 2A:84A-32a(d)(2).
Prior to the remand, the trial court held that defendant had not demonstrated that a motion for a new trial would be granted if the results of a new DNA test were favorable to defendant, as required by N.J.S.A. 2A:84A-32a(d)(5). To be entitled to a new trial based on newly discovered evidence, a defendant must demonstrate that the new evidence is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." State v. Carter, 85 N.J. 300, 314, 426 A.2d 501 (1981). See also Peterson, supra, 364 N.J.Super. at 398, 836 A.2d 821; State v. Halsey, 329 N.J.Super. 553, 559, 748 A.2d 634 (App. Div.), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000).
In Peterson, supra, 364 N.J.Super. at 390, 836 A.2d 821, defendant filed a post-conviction motion for DNA testing after he was convicted by a jury of felony murder and aggravated sexual assault. On appeal following the trial court's denial of the motion, we "note[d] that N.J.S.A. 2A:84A-32a(d)(5) does not require a convicted person to make a threshold showing that there is a `reasonable probability' DNA testing will produce favorable results." Id. at 396, 836 A.2d 821. We stated that "[t]he `reasonable probability' requirement of N.J.S.A. 2A:84A-32a(d)(5) applies only to the grant of a new trial in the event the results of DNA testing are favorable." Id. at 396-97, 836 A.2d 821. Indeed, "even if a trial court concludes, in light of the overwhelming evidence of a defendant's guilt presented at trial, that it is unlikely DNA testing will produce favorable results, the court may not deny a motion for DNA testing on that basis." Id. at 397, 836 A.2d 821. Instead, we concluded that
because it is difficult to anticipate what results DNA testing may produce in advance of actual testing, the trial court should postulate whatever realistically possible test results would be most favorable to defendant in determining whether he has established that "favorable" DNA testing "would raise a reasonable probability . . . a motion for new trial based upon newly discovered evidence would be granted," N.J.S.A. 2A:84A-32a(d)(5).
[Ibid. (emphasis added) (alteration in original).]
We also concluded that "DNA testing which showed that another person was the source of the crime scene evidence that the State's expert witness . . . attributed to *805 defendant certainly would be `material to the issue [of defendant's identity] and not merely cumulative or impeaching or contradictory.'" Id. at 398, 836 A.2d 821. Moreover, the more advanced post-conviction testing "would also constitute evidence `discovered since the trial.'" Ibid. We further stated that "DNA test results that not only tended to exculpate defendant but to implicate someone else would be evidence of `the sort that would probably change the jury's verdict if a new trial were granted.'" Id. at 398-99, 836 A.2d 821 (emphasis added). We therefore reversed and remanded the matter for entry of an order granting DNA testing. Id. at 399, 836 A.2d 821. Compare State v. Reldan, 373 N.J.Super. 396, 404, 861 A.2d 860 (App. Div.2004) (affirming denial of post-conviction DNA testing because "DNA testing of the hairs found in Reldan's car would not exculpate him, rather at best it might indicate that those particular hairs were not those of either or both of the victims, something that would not change the jury's verdict where, as here, there was overwhelming evidence linking Reldan to the crimes" (emphasis added)), certif. denied, 182 N.J. 628, 868 A.2d 1031 (2005). See also Halsey, supra, 329 N.J.Super. at 559-60, 748 A.2d 634; State v. Velez, 329 N.J.Super. 128, 136, 746 A.2d 1073 (App. Div.2000); State v. White, 260 N.J.Super. 531, 539, 617 A.2d 272 (App.Div.1992), certif. denied, 133 N.J. 436, 627 A.2d 1141 (1993) (decided before N.J.S.A. 2A:84A-32a was enacted).
We recognize that there are distinctions between the case before us and Peterson, but those distinctions do not warrant denial of further testing which defendant has always contended would exonerate him. At trial in Peterson, a senior forensic expert for the State Police "expressed the opinion that seven hairs found at the crime scene had the same characteristics as defendant's hair [and] [t]hree of those hairs were discovered in the victim's pubic combings,"[5] but "[t]he State did not present any evidence concerning the source of the semen on the victim's pants or the blood under her fingernails [and] [n]o DNA testing was performed on any of the physical evidence presented at trial." Peterson, supra, 364 N.J.Super. at 392, 836 A.2d 821. In this case there was, in fact, pretrial DNA testing, but as developed by Judge Skillman in Peterson, "even though some early forms of DNA testing were in use at the time of defendant's trial. . . DNA testing has become more common and more reliable in the intervening [twelve] years" since defendant's conviction. Id. at 398, 836 A.2d 821.[6]
Moreover, defendant was convicted based on circumstantial evidence tying him to the murder, despite the testimony that the semen found in the victim's mouth did not match his DNA. Under these circumstances, and in light of the United States Supreme Court's recent opinion in Holmes v. South Carolina, ___ U.S. ___, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), that a state cannot preclude a defendant from presenting evidence of third-party guilt simply because the evidence against him strongly supports a guilty verdict, we believe that defendant has satisfied N.J.S.A. 2A:84A-32a(d)(5).
It is well established that "[a] defendant is entitled to introduce evidence *806 that another person committed the crime or crimes of which the defendant is charged." State v. Cook, 179 N.J. 533, 566, 847 A.2d 530 (2004) (citing State v. Jimenez, 175 N.J. 475, 486, 815 A.2d 976 (2003)); see also State v. Garfole, 76 N.J. 445, 453, 388 A.2d 587 (1978) (Garfole I). This can be done in two ways. In some cases, a defendant "attempts to place responsibility for the crime on a specific third party." Cook, supra, 179 N.J. at 566, 847 A.2d 530 (citing State v. Koedatich, 112 N.J. 225, 297-312, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989)). In other cases, a defendant seeks to introduce "other-crimes evidence defensively." Ibid. (citing Garfole I, supra, 76 N.J. at 453, 388 A.2d 587).
In Cook, a defendant who was convicted of murder argued on appeal "that he was denied a fair trial because he was prevented from making a presentation to the jury concerning evidence of a similar murder, committed while defendant was incarcerated, that would have presented the prospect of third-party guilt." Id. at 565-66, 847 A.2d 530. In evaluating this argument, Justice LaVecchia wrote:
The standard for introducing defensive other-crimes evidence is lower than the standard imposed on "the State when such evidence is used incriminitorily [because] when the defendant is offering that proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility."
[Id. at 566, 847 A.2d 530 (quoting Garfole I, supra, 76 N.J. at 452-53, 388 A.2d 587) (emphasis added) (alteration in original).]
However, the Court limited this holding by adding a N.J.R.E. 403 balancing test to the analysis: "Even if defensive other-crimes evidence passes the `simple' relevancy test," courts still must consider whether the probative value of the evidence "`is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of . . . confusing the issues or of misleading the jury.'" Ibid. (quoting Garfole I, supra, 76 N.J. at 455-56, 388 A.2d 587). See also Holmes, supra, ___ U.S. at ___, 126 S.Ct. at 1733, 164 L.Ed.2d at 510-11. This determination is "`highly discretionary,' depending as it does on the weighing and balancing of the various Rule 403 factors." Cook, supra, 179 N.J. at 567, 847 A.2d 530 (quoting Garfole I, supra, 76 N.J. at 457, 388 A.2d 587).
Under this balancing test, our Supreme Court affirmed the trial court's denial of Cook's proffered evidence of third-party guilt. Id. at 569, 388 A.2d 587. The Court held that although there were "superficial" similarities between the victim in defendant's case and the victim in another crime that defendant sought to introduce, "the probative value of the proffered evidence was minimal" since there were significant differences between the crimes as well. Id. at 568, 388 A.2d 587. Moreover, if the evidence had been admitted, the trial court would have had "to hold a `mini-trial' of sorts on serial killers and homicidal pathology to link the two crimes, an exercise" the Court said would have "tremendous potential for confusing and misleading the jury." Ibid. Therefore, the Cook Court affirmed the trial court's holding "that those countervailing factors substantially outweighed the minimal probative value of the proffer and excluded the evidence." Ibid.
The present case is distinguishable from Cook because, at a new trial, defendant would not seek to introduce "defensive other-crimes evidence," but instead to place direct responsibility for the very *807 crime in question on a specific third party. See Peterson, supra, 364 N.J.Super. at 396, 836 A.2d 821 (concluding that, in the post-conviction context, "the strength of the evidence against a defendant is not a relevant factor in determining whether his identity as the perpetrator was a significant issue[,]" since the evidence of third party guilt can affect the strength of the State's case). See also Holmes, supra, ___ U.S. at ___, 126 S.Ct. at 1735, 164 L.Ed.2d at 513 (reversing a murder conviction on direct appeal where evidence of third party guilt was excluded because of the strength of the State's case). Moreover, defendant was convicted of murder related to an aggravated sexual assault for which he had originally been indicted, even though that charge had been dismissed before the first trial; and identification of the semen donor could well exculpate defendant, particularly if the sexual relations could provide a motive for the murder, or the identification could result in other evidence to support the motion for a new trial.
Technological advances since defendant's conviction have enabled the production of DNA typing data, which could be run through the CoDIS system and potentially implicate another suspect. See A.A. v. Attorney General, 384 N.J.Super. 67, 83-85, 894 A.2d 31 (App.Div.), certif. granted, 186 N.J. 366, 895 A.2d 452 (2006).[7] There is a potential that the test results, if beneficial to defendant, would be admissible under Holmes and Cook, and entitle defendant to a new trial. Accordingly, we reverse the trial court's determination that defendant did not satisfy N.J.S.A. 2A:84A-32a(d)(5).
Finally, the trial court found that defendant had failed to establish that the evidence to be tested, which was tested previously, would provide results that were reasonably more discriminating and probative of the identity of the offender, as required by N.J.S.A. 2A:84A-32a(d)(6)(b). However, re-testing the samples could enable defendant to compare the evidence to the DNA of convicted offenders whose DNA profiles are now on file. See A.A., supra, 384 N.J.Super. at 83-85, 894 A.2d 31; N.J.S.A. 53:1-20.21(g). Since the information in the data banks was not available at the time of the testing in defendant's case, the results may now identify the source of the semen.

IV.
Accordingly, we reverse the order of the Law Division and remand the matter for further DNA testing on the remaining biological samples.
NOTES
[1] In detail, defendant's point headings contend that (1) "the conclusion by the court below that the evidence was not sufficient for testing was clearly erroneous"; (2) "the conclusion by the court below that the chain of custody was insufficient is unsupportable since the chain of custody was established at trial without objection by the State and, thereafter, the evidence has remained in the custody of the State"; (3) "there is a reasonable probability that if the results were favorable to the defendant, a motion for a new trial based upon newly discovered evidence would be granted"; and (4) some of the elements of the statute were uncontested by the State and, in any event, all of the statutory requirements for post-conviction DNA testing "have been clearly established."
[2] Neither the indictment nor trial transcript (other than discrete excerpts) have been presented to us, but these facts are undisputed and developed in our prior opinions.
[3] The jury declined to impose the death penalty, so the impact of the prior "hung jury" did not have to be considered with respect to that subject.
[4] Defendant's brief filed before the remand states:

The court below also agreed with the State that the chain of custody for D[]14 [the test results concerning the sperm found in the victim's mouth] is insufficient. In support of that position, the State had relied on events which preceded the introduction of D14 into evidence. However, at trial, the State did not object to [the] evidence's admissibility, no doubt because the chain of custody was testified to under oath by the State's own witness. Thus, the State waived any objection to the chain of custody based on events which preceded its concession that the chain of custody had been established. Since that concession, the evidence has remained in the custody of the State. There is no reason to believe, and the State has offered no evidence, that the evidence has been tampered with or altered in any way since it was offered into evidence at trial with the State's consent.
[5] Peterson had been convicted of aggravated sexual assault and felony murder based thereon. Peterson, supra, 364 N.J.Super. at 390, 836 A.2d 821.
[6] We do not suggest that post-conviction DNA testing can be conducted frequently or on multiple occasions, but we can take judicial notice of the technological developments in the fifteen years since the testing was performed in this case.
[7] We have recently sustained the testing of all defendants convicted of crimes, which will place the DNA of numerous additional offenders into the DNA data bank. A.A., supra, 384 N.J.Super. at 81-82, 894 A.2d 31. Defendant's potential ability to identify a third party is a different issue than the ability to use the DNA evidence against the third party. See id. at 113-116, 894 A.2d 31 (concurring opinion). With reference to a defendant's access to the DNA data bank for comparative purposes, see N.J.S.A. 53:1-20.21(g); N.J.S.A. 53:1-20.24(a). See also A.A., supra, 384 N.J.Super. at 85, 894 A.2d 31. We do not herein address any constitutional due process right to access to assert third party guilt on an adequate showing.